1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11  GERLING GLOBAL REINSURANCE
    CORP. OF AMERICA, et al.,
12                                    NO. CIV. S-00-0506 WBS JFM
              Plaintiffs,
13
         v.                           <u>MEMORANDUM AND ORDER</u>;
14                                    <u>PRELIMINARY INJUNCTION</u>
    CHUCK QUACKENBUSH in his
15  capacity as COMMISSIONER OF
    INSURANCE OF THE STATE OF
16  CALIFORNIA,

17            Defendant.
    _____/
18
    AMERICAN INSURANCE ASSOCIATION
19  and AMERICAN RE-INSURANCE        NO. CIV. S-00-0613 WBS JFM
    CO.,
20
              Plaintiffs,
21
         v.
22
    CHUCK QUACKENBUSH in his
23  capacity as COMMISSIONER
    OF INSURANCE OF THE STATE
24  OF CALIFORNIA,

25            Defendant.
    _____/
26

27

28

                              1

1  WINTERTHUR INTERNATIONAL
   AMERICA INSURANCE CO., et al.,        NO. CIV. S-00-0779 WBS JFM
2
3          Plaintiffs,

4      v.

5  CHUCK QUACKENBUSH in his
   capacity as COMMISSIONER
6  OF INSURANCE OF THE STATE
   OF CALIFORNIA,

7          Defendant.
   _____/
8
9  ASSICURAZIONI GENERALI S.p.A.,
                                          NO. CIV. S-00-0875 WBS JFM
           Plaintiff,
10
11     v.

12 CHUCK QUACKENBUSH in his
   capacity as COMMISSIONER
   OF INSURANCE OF THE STATE
13 OF CALIFORNIA,

14         Defendant.
   _____/
15

16                    ----oo0oo----

17         In October 1999, California enacted the Holocaust

18 Victim Insurance Relief Act ("HVIRA"). See Cal. Ins. Code §§

19 13800-13807 and accompanying regulations, Cal. Code Regs. Tit. 10

20 §§ 2278-2278.5.[1]  The stated purpose of the HVIRA is for

21 insurance companies doing business in the State of California to

22 ensure that "any involvement they or their related companies may

23 have had with insurance policies of Holocaust victims are

24 _____

25         [1]   Some of the plaintiffs use the term "HVIRA" to refer to
   all statutes related to California Insurance Code sections 13800-
26 13807, including California Insurance Code section 790.15 and
   California Code of Civil Procedure section 354.5.  In fact, the
27 latter two sections were enacted before Insurance Code sections
   13800-13807 and are not part of the HVIRA.  When the court uses
28 the term "HVIRA," it refers only to California Insurance Code
   sections 13800-13807 and the accompanying regulations.

                              2

1  disclosed to the state and to ensure the rapid resolution of

2  these questions, eliminating further victimization of these

3  policyholders and their families."  Cal. Ins. Code § 13801(e).

4  Each set of plaintiffs has moved against defendant Chuck

5  Quackenbush, the California Commissioner of Insurance, for a

6  preliminary injunction against enforcement of the HVIRA and

7  accompanying regulations on the grounds that they are

8  unconstitutional and that such enforcement will cause plaintiffs

9  irreparable harm.  See Fed. R. Civ. P. 65.[2]

10  II.  Facts

11      A.  The Statutes

12          The disputed statutes and regulations relate to claims

13  asserted by Holocaust victims or their heirs or beneficiaries for

14  coverage under insurance policies issued in Europe between 1920-

15  1945.  After the National Socialist (NAZI) party came to power,

16  it enacted a series of statutes authorizing governmental

17  confiscation of Jewish property and other assets, including

18  insurance proceeds.  Under these NAZI statutes, German insurers

19  were required to pay the proceeds of insurance policies of Jewish

20  residents to "blocked accounts" controlled by the NAZI

21  government.  A 1943 statute ordered confiscation of the estates

22  _____

23          [2]  Gerling additionally moves for a preliminary injunction
    against enforcement of California Civil Procedure Code section

24  354.5 and California Insurance Code section 790.15.  The court
    dismisses Gerling's motion as to these two claims.  (See Order

25  re: Motion to Dismiss, filed concurrently.)  Hence, the court
    only considers the parties' motions for preliminary injunction
    against enforcement of the HVIRA.

26          Gerling also moves for summary judgment on the same
    claims discussed in its motion for preliminary injunction.

27  Because discovery is incomplete, and defendant has not responded
    to that motion, the court does not consider it at this time.  See

28  Fed. R. Civ. P. 56(f).

1  of deceased Jews.  Further, although many Holocaust victims had

2  insurance policies, many lost the papers during their

3  imprisonment.  In many cases, the persons most knowledgeable

4  about the policy were killed, leaving heirs without a paper

5  trail.  As a result, many Holocaust victims and their descendants

6  and heirs have never collected on insurance policies.

7  The HVIRA requires insurance companies doing business

8  in California to file reports disclosing policies issued in

9  Europe during the period 1920-1945.  <u>See</u> Cal. Ins. Code §§ 13800-

10  13807.  Other statutes extend the statute of limitations for

11  filing such claims (Cal. Civ. Proc. Code § 354.5), and suspend

12  the license of insurance companies who have not paid valid claims

13  (Cal. Ins. Code § 790.15).

14  1.  <u>California Insurance Code §§ 13800-13807 ("HVIRA")</u>

15  The HVIRA obligates insurers doing business in

16  California to file reports identifying insurance policies (life,

17  property, liability, health, annuities, dowry, educational, or

18  casualty) sold to persons in Europe between 1920 and 1945

19  directly or through a "related company."  Cal. Ins. Code §

20  13804(a).  A "related company" is "any parent, subsidiary,

21  reinsurer, successor in interest, managing general agent, or

22  affiliate company of the insurer."  Cal. Ins. Code § 13802(b).

23  Specifically, the statute requires the insurer or related company

24  to file with the registry: (1) the number of those insurance

25  policies; (2) the holder, beneficiary, and current status of

26  those policies; and (3) the city of origin, domicile, or address

27  for each policy holder.  <u>See</u> Cal. Ins. Code § 13804(a).  Further,

28  with regard to each policy, the insurer must certify one of the

4

following: (1) that the proceeds of the policies have been paid to the designated beneficiaries or their heirs where that person or persons, after diligent search, could be located and identified; (2) that the proceeds where the beneficiaries or heirs could not, after diligent search, be located or identified, have been distributed to Holocaust survivors or to qualified charitable nonprofit organizations for the purpose of assisting Holocaust survivors; (3) that a court of law has certified in a legal proceeding resolving the rights of unpaid policyholders, their heirs, and beneficiaries, a plan for the distribution of the proceeds; or (4) that the proceeds have not been distributed and the amount of those proceeds.  See Cal. Ins. Code § 13804(b).

Under the regulations, these reports were to be filed on or before April 7, 2000.  See Cal. Code Regs. § 2278.4.  Under the statute, if the reports were not filed by the 210th day after the HVIRA became effective (May 7, 2000), the Commissioner "shall suspend the certificate of authority to conduct insurance business in the state...."  Cal. Ins. Code § 13806.[3]

### 2.  California Civil Procedure Code § 354.5

Under this statute, any Holocaust victim or heir or beneficiary who resides in the state may bring a legal action to recover on any claim arising out of an insurance policy or policies purchased or in effect in Europe before 1945 from an insurer (defined term), "notwithstanding any other provision of law."  Cal. Civ. Proc. Code § 354.5(b).  Further, it forbids

---

[3]    Defendant has represented that he will not attempt to enforce the statute against plaintiffs until 20 days after the motions for preliminary injunction have been heard.

1  dismissal of any claim whether brought by a resident or

2  nonresident on statute of limitations grounds as long as the

3  action is commenced on or before December 31, 2010.  <u>See</u> Cal.

4  Civ. Proc. Code § 354.5(c)

5           3.  <u>California Insurance Code § 790.15</u>

6           This statute modifies the Insurance Code to empower

7  the Insurance Department of the State of California to suspend

8  the license of an insurer admitted to do business in California

9  if the Department concludes that an "affiliate" of the insurer

10  has failed to pay any valid claim from Holocaust survivors.

11     B.  <u>International Negotiations</u>

12           The federal government, along with foreign governments

13  and insurance companies, is also grappling with the same goal of

14  giving Holocaust victims some compensation for lost monies from

15  insurance policies.

16           The United States and German governments have recently

17  negotiated the formation of the Foundation for Remembrance,

18  Responsibility, and the Future ("Foundation") funded by the

19  German government and German corporations to resolve the claims

20  of Holocaust victims.  The Foundation is capitalized with

21  approximately $5 billion dollars toward payments of victims of

22  slave and forced labor, as well as payments on asserted claims

23  related to insurance, banking, taking of property, and medical

24  experiments.  In a December 13, 1999 letter to Chancellor

25  Schroeder, President Clinton stated that the executive agreement

26  between the two countries shall state that the "Foundation should

27  be regarded as the exclusive remedy for all claims against German

28  companies arising out of the Nazi era."  (American: Sullivan

1 Decl. Ex. 6, 12/13/99 Clinton letter to Schroeder)[4].  Deputy

2 Secretary of the Treasury Stuart Eizenstat is the principal

3 representative of the United States on these issues.

4      A second organization, the International Commission on

5 Holocaust Era Insurance Claims ("ICHEIC"), chaired by former

6 Secretary of State Lawrence Eagleburger, was established as a

7 voluntary organization between European regulators, major

8 European insurance companies, representatives of Jewish and

9 Holocaust survivor organizations, Israel, and the National

10 Association of Insurance Commissioners in the United States.

11 Generali and the Winterthur plaintiffs are members.

12      The framework for the ICHEIC is set out in a Memorandum

13 of Understanding ("MOU").  Among other things, the MOU provides

14 that the ICHEIC shall conduct an investigatory process to

15 determine the current status of insurance policies issued to

16 Holocaust victims for which claims are filed with the ICHEIC and

17 shall establish a claims process to settle and pay individual

18 claims.  (American: Sullivan Decl. Ex. 13, MOU).  Eizenstat told

19 the House Banking Committee that "[t]he U.S. Government has

20 supported the International Commission on Holocaust Era Insurance

21 Claims since it began, and we believe it should be considered the

22 exclusive remedy for resolving insurance claims from the World

23 War II era."  (Winterthur: Grimm Decl. Ex. I, Eizenstat 2/9/00 at

24

25

26

27      [4]    Many of the exhibits appear in some or all of the
28 various plaintiffs' papers.  The court will only cite to one
location of each exhibit.

House Banking Committee hearing).[5]   It is expected that the German Foundation will recognize the ICHEIC as the exclusive mechanism for resolving insurance claims.   (Winterthur: Grimm Decl. Ex. I, Eizenstat 2/9/00 at House Banking Committee hearing).[6]

C. <u>The Parties</u>

Plaintiffs in all four cases are insurance companies licensed to do business in California.   Each set of plaintiffs alleges that the statutes are unconstitutional.   In all four cases, defendant is Chuck Quackenbush in his capacity as the Commissioner of Insurance of the State of California.

///

///

///

---

[5]   Defendant objects that Eizenstat's statement lacks foundation and is inadmissible hearsay.   At the preliminary injunction stage, however, the court may consider hearsay.   "The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.   The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."   <u>Flynt Distrib. Co., Inc. v. Harvey</u>, 734 F.2d 1389, 1394 (9th Cir. 1984).   Consequently, the court does not discuss each of defendant's evidentiary objections.

[6]   The plaintiffs also discuss a 1995 agreement between the United States and Germany to "settle compensation claims by certain United States nationals who suffered loss of liberty or damage to body or health as a result of National Socialist measures of persecution directly against them."   This agreement provided for two separate payments by Germany in settlement of the claims.   In return for the payments by the German government, the United States "declare[d] all compensation claims against the Federal Republic of Germany by United States nationals for damage within the meaning of [the Agreement] to be finally settled."   This Agreement, although related in topic, is not directly applicable because it deals with claims against Germany, not against insurance companies, and does not appear to involve insurance claims.

8

1.  <u>Gerling Global Reinsurance Corporation of America</u>
<u>("Gerling")</u>

Plaintiffs are five insurance companies licensed to do business in California.  They are "related to" or "affiliated" with two German companies (Gerling-Konzern Allgemenine Versicherungs-AG ("GKA") and Gerling-Konzern Lebensversicherungs-AG ("GKL") that issued policies in Europe during the proscribed time period.  Hence, they have to file reports.  Gerling alleges that the HVIRA is unconstitutional under: (1) the constitutional grant of authority to the federal government over foreign affairs; (2) the Commerce Clause; (3) the Due Process Clause; (4) Bill of Attainder; (5) the Fourth Amendment; and (6) the Contracts Clause.

2.  <u>American Insurance Association and American Re-</u>
<u>Insurance Co. (together, "American")</u>

Plaintiffs are American Insurance Association ("AIA") and American Reinsurance Company ("AmRe").  AIA principally represents American insurance companies that did not issue insurance policies in Europe during the relevant period and do not own or control any companies that did.[7]  Five members of AIA are related to European companies that issued the applicable policies.  AmRe is a large insurance company licensed to do business in California.  AmRe claims that neither it, nor any subsidiary or affiliate over which it has control, issued insurance policies that were in effect in Europe during 1920-

---

[7]    Assicurazioni Generali, a European Company, is also represented by American Insurance, but files its own motion for preliminary injunction.

1945.

American claims that the statutes are unconstitutional for three reasons: (1) the HVIRA treads on the federal government's exclusive power to conduct foreign relations; (2) the HVIRA violates the Foreign Commerce Clause; and (3) the HVIRA violates the Due Process clause.

3.   <u>Winterthur International American Insurance Co., et al. (together, "Winterthur")</u>

Plaintiffs are nine insurance companies licensed to do business in California.  None of the companies ever issued insurance policies in Europe during the applicable time period, though each is "related" to such a company.  Each plaintiff claims, however, that it is not in possession, custody, or control of any records pertaining to insurance companies sold by "related companies."

Winterthur argues that the HVIRA is unconstitutional because: (1) it is an unconstitutional invasion of the federal government's foreign affairs power; (2) it violates the Dormant Commerce Clause; (3) it violates the Due Process Clause; (4) it deprives plaintiffs of rights secured by the Equal Protection Clause; (5) it is an unconstitutional bill of attainder; and (6) implementation constitutes an unreasonable search and seizure.

4.   <u>Assicurazioni Generali, S.p.A ("Generali")</u>

Generali is an Italian insurance company that issued insurance policies in Europe during the applicable time period. Generali is represented by the AIA, but has filed separately because it claims that the Insurance Commissioner has singled it out for attack, even though it has been paying insurance claims

10

1  from Holocaust victims for the last several years.

2       Generali claims the HVIRA unconstitutionally violates

3  the Due Process and Commerce Clauses and invades the foreign

4  affairs power of the federal government.

5       D.   Threatened Enforcement

6       The Commissioner has actively threatened enforcement

7  against all plaintiffs.  He subpoenaed many insurance companies,

8  including plaintiffs and those represented by plaintiffs, to

9  appear at a hearing on December 1, 1999.  At the hearing,

10  Quackenbush informed the insurance companies, "[t]his issue will

11  be resolved in California.  I promised that for the last two

12  years.  And on April 6th, you're going to see just how serious

13  California is if you have not complied with this law."

14  (Generali: Tiberini Decl., Ex. 10, Transcript of 12/1/99

15  Investigatory Hearing, 14:16-20).  He told Generali specifically,

16  "I want you to take back to your officers in Italy and everywhere

17  else, that you might want to consider seriously leaving the

18  State, because it's obvious to me right now that you have no

19  intention of complying with the law."  (Generali: Tiberini Decl.,

20  Ex. 10, Transcript of 12/1/99 Investigatory Hearing, 49:12-16).

21  At the end of questioning Generali, Quackenbush stated generally,

22  "[i]t is your choice now whether you're going to work with this

23  Department of Insurance to bring your company in full compliance,

24  whether you're going to leave the state voluntarily, or whether

25  I'm going to kick you out.  That's your three choices."

26  (Generali: Tiberini Decl., Ex. 10, Transcript of 12/1/99

27  Investigatory Hearing, 51:19-23).

28  ///

1  II.   <u>Standard</u>

2           "To obtain a preliminary injunction, a party must

3  establish either: (1) probable success on the merits and

4  irreparable injury, or (2) sufficiently serious questions going

5  to the merits to make the case a fair ground for litigation with

6  the balance of hardships tipping decidedly in the movant's

7  favor."   <u>See</u> <u>Baby Tam & Co. v. City of Las Vegas</u>, 154 F.3d 1097,

8  1100 (9th Cir. 1998).   These two formulations represent two

9  points on a sliding scale in which the required degree of

10  irreparable harm increases as the probability of success

11  decreases.   <u>See</u> <u>id</u>.   The movant has the burden of proving each

12  element of either test.   <u>See</u> <u>Prescott v. County of El Dorado</u>, 915

13  F. Supp. 1080, 1084 (E.D. Cal. 1996).

14           Under the doctrine of <u>Ex Parte Young</u>, 209 U.S. 123

15  (1908), it is appropriate for a party to move for a preliminary

16  injunction in federal court against state officers "who threaten

17  and are about to commence proceedings, either of a civil or

18  criminal nature, to enforce against parties affected an

19  unconstitutional act, violating the Federal Constitution...."

20  <u>Id.</u> at 156.   A preliminary injunction is particularly appropriate

21  when the moving party is faced with a "Hobson's choice" of

22  continuing to violate the law, thus exposing itself to huge

23  liability, or to "violate the law once as a test case and suffer

24  the injury of obeying the law during the pendency of the

25  proceedings and any further review."   <u>Morales v. Trans World</u>

26  <u>Airlines, Inc.</u>, 504 U.S. 374, 381 (1992).

27  ///

28  ///

12

1  III.   <u>Probability of Success on the Merits</u>

2           Among them, the various plaintiffs make seven claims

3  regarding the constitutionality of the statutes.   They claim that

4  the statutes violate:   (1) the constitutional grant of authority

5  to the federal government over foreign affairs (all parties); (2)

6  Commerce Clause (all parties); (3) the Due Process Clause (all

7  parties); (4) Bill of Attainder (Gerling and Winterthur); (5) the

8  Fourth Amendment (Gerling and Winterthur); (6) the Contracts

9  Clause (Gerling); and (7) Equal Protection (Winterthur).   The

10 court finds that plaintiffs have established a probability of

11 success under the foreign affairs doctrine and the Commerce

12 Clause.   Accordingly, the court limits its analysis to these

13 claims, and it is unnecessary to address the other claims.

14      A.   <u>Foreign Affairs</u>

15           The framers of the Constitution made clear that the

16 federal government was to have supreme power in the general field

17 of foreign affairs.   <u>See</u> <u>Hines v. Davidowitz</u>, 312 U.S. 52, 62

18 (1941).   James Madison, in addressing the people of the State of

19 New York, explained that the proposed Constitution contained a

20 "class of powers, lodged in the general government, consist[ing]

21 of those which regulate the intercourse with foreign nations....

22 This class of powers forms an obvious and essential branch of the

23 federal administration.   If we are to be one nation in any

24 respect, it clearly ought to be in respect to other nations."

25 Madison, <u>The Federalist Papers</u>, No. 42.   Alexander Hamilton

26 wrote, regarding the power of the federal judiciary over laws

27 which involve the peace of the confederacy: "the peace of the

28 WHOLE ought not be left at the disposal of a PART.   The Union

13

1  will undoubtably be answerable to foreign powers for the conduct

2  of its members.  And the responsibility for an injury ought ever

3  be accompanied with the faculty of preventing it."  Hamilton, The

4  Federalist Papers, No. 80.[8]

5         The Supreme Court has clarified the federal

6  government's control over foreign affairs.  "The Constitution

7  entrusts [the nation's foreign affairs and international

8  relations] solely to the Federal Government."  Zschernig v.

9  Miller, 389 U.S. 429, 436 (1968).  "Power over external affairs

10  is not shared by the States; it is vested in the national

11  government exclusively."  United States v. Pink, 315 U.S. 203,

12  233 (1942).  "Our system of government is such that the interest

13  of the cities, counties and states, no less than the interest of

14  the people of the whole nation, imperatively requires that

15  federal power in the field affecting foreign relations be left

16  entirely free from local interference."  Hines, 312 U.S. at 63.

17         Zschernig is the most recent case addressing the issue

18  of foreign affairs.  This case involved an Oregon probate law

19  that conditioned inheritance rights of a nonresident alien upon

20  the alien's ability to demonstrate that his country of origin

21  would grant reciprocal rights to a U.S. citizen and would not

22  confiscate any of the inherited property.  See Zschernig, 389

23  U.S. at 430-431.  The Court held that the statute "affect[ed]

24  international relations in a persistent and subtle way," id. at

25  440, had "great potential for disruption or embarrassment," id.

26

27        [8]   See also The Federalist Papers Nos. 3, 4.  Here, John
Jay discusses the importance of the national government in
28  relation to keeping the peace with foreign powers.

1  at 435, and had "more than some incidental or indirect effect in

2  foreign countries," id. at 434.   Thus, the statute intruded into

3  "matters which the Constitution entrusts solely to the Federal

4  Government."   Id. at 436.[9]

5          1.   The HVIRA's Goal is International in Nature

6          The stated goal of the HVIRA is to exercise a power

7  exclusively entrusted to the national government.   The statute

8  states that "[t]his chapter is necessary to ... encourage the

9  development of a resolution to these [insurance claim] issues

10 through the international process or through direct action by the

11 State of California, as necessary."   Cal. Ins. Code § 13801(f).

12 Encouraging resolution through an international process clearly

13 implicates matters of foreign affairs, and, as such, is a

14 function vested in the national government.

15          2.   Effects on International Relations and Potential

16 for Disruption and Embarrassment

17          Plaintiffs have demonstrated a probability that the

18 HVIRA affects international relations.   The United States federal

19 government has been actively involved in compensating Holocaust

20 victims since the end of World War II.   In 1952, the United

21 States was a party to a treaty among France, England, the United

22

23          [9]     The First Circuit applied and interpreted Zschernig in
   National Foreign Trade Council v. Natsios, 181 F.3d 38 (1st Cir.
24 1999), cert. granted, 120 S. Ct. 525 (1999).   There, the First
   Circuit declared unconstitutional a Massachusetts law which
25 restricted the ability of Massachusetts and its agencies to
   purchase goods or services from companies that do business with
26 Burma.   See id.   The First Circuit held that the law had "more
   than an incidental or indirect effect in foreign countries,"
27 Natsios, 181 F.3d at 52 (quoting Zschernig, 389 U.S. at 434), and
   a "great potential for disruption or embarrassment" as evidenced
28 by the protests of America's trading partners, id. at 54 (quoting
   Zschernig, 389 U.S. at 435).

1   States, and Germany transferring to the Federal Republic of

2   Germany the responsibility for implementing reparations.  "The

3   Federal Republic [of Germany] acknowledges the obligation to

4   assure ... adequate compensation to persons persecuted for their

5   political convictions, race, faith or ideology, who thereby have

6   suffered damage to life, limb, health, liberty, property, their

7   possessions or economic prospects (excluding identifiable

8   property subject to restitution)."  (Gerling: Appendix of

9   Authorities, Ex. A, Transition Agreement, Ch. 4 ¶ 1).  Since that

10  treaty, the United States has been actively involved in Holocaust

11  victims compensation efforts.  The HVIRA has a strong potential

12  of interfering with these efforts.

13          First, the HVIRA has the real potential of frustrating

14  the United States' efforts in negotiating the German Foundation.

15  This Foundation, capitalized at close to $5 billion, will provide

16  payments to victims of slave and forced labor as payments on

17  asserted claims related to insurance, banking, taking of

18  property, and medical experiments.  On December 17, 1999,

19  Secretary of the Treasury Stuart Eizenstat, the Special

20  Representative of the Secretary of State and the President on

21  Holocaust-Related Issues Senate Foreign Relations Committee,

22  stated that "[i]n the context of a comprehensive German

23  Foundation, in all cases, consensual and non consensual, brought

24  against German companies for claims arising out of the Nazi-era,

25  we are prepared to say that the German Foundation should be

26  regarded as the exclusive remedy and that dismissal of such cases

27  would be in our foreign policy interests."  (American: Sullivan

28

                                    16

1  Decl. Ex. 11, 12/17/99 Press Release).[10]   The German Foundation

2  cannot be the exclusive remedy if California's HVIRA is also

3  applicable.

4         Second, the HVIRA has a potentially negative effect on

5  the ICHEIC, which is a voluntary organization of European

6  regulators, major European insurance companies, representatives

7  of Jewish and Holocaust survivor organizations, Israel, and the

8  National Association of Insurance Commissioners in the United

9  States insurance companies.   The ICHEIC investigates Holocaust

10  era insurance policies and helps settle claims.   Eizenstat wrote

11  Quackenbush in November 1999 that the HVIRA "has the unfortunate

12  effect of damaging the one effective means now at hand to process

13  quickly and completely unpaid insurance claims from the Holocaust

14  period, the International Commission on Holocaust Era Insurance

15  Claims...." (American: Sullivan Decl. Ex. 24, 11/30/99 Eizenstat

16  letter to Quackenbush).   Further, Eizenstat informed Quackenbush,

17  "you should know that actions by California, pursuant to this

18  law, have already threatened to damage the cooperative spirit

19  which the International Commission requires to resolve the

20  important issue for Holocaust survivors." (American: Sullivan

21  Decl. Ex. 24, 11/30/99 Eizenstat letter to Quackenbush).

22  Eizenstat wrote Governor Davis on the same day, stating, "actions

23  by California, pursuant to this law, have already potentially

24  damaged and could derail both a settlement of forced and slave

25  labor negotiations and the progress already achieved by the

26

27         [10]   Defendant argues that the German Foundation is not in
place, and thus is not a federal policy.   However, the very
28  negotiation for a German Foundation dedicated toward compensation
implicates foreign policy.

International Commission on Holocaust Era Insurance Claims...."
(American: Sullivan Decl. Ex. 23, 11/30/99 Eizenstat letter to
Governor Davis).

Former Secretary of State Lawrence Eagleburger, the
chair of the ICHEIC, testified that he believes that under the
terms of the MOU under which the ICHEIC was organized, each
insurance company that signed the MOU and is fully cooperating in
the ICHEIC process "is entitled to receive, and should receive,"
an exemption from the enforcement of legislation such as the
HVIRA. (Winterthur: Eagleburger Decl. ¶ 12). Section 10 of the
MOU requires signatories to "work to achieve exemptions from
related pending and future legislation ... for those insurers
that become signatories to this MOU and which fully cooperate
with the processes and funding of the IC." (Winterthur:
Eagleburger Decl. Ex. A.). ICHEIC members include plaintiffs
Winterthur and Generali.

Third, the HVIRA potentially conflicts with the January
29, 2000 Joint Statement issued by the United States and Swiss
governments at the inaugural meeting establishing the Swiss-US
Joint Economic Commission ("Joint Statement"). Specifically, in
the Action Plan attached to the Joint Statement, the United
States government promised to "call on the U.S. State insurance
Commissioners and State legislative bodies to refrain from taking
unwarranted investigative initiatives or from threatening or
actually using sanctions against Swiss insurers." (Winterthur:
Thalmann Supp. Decl. Ex. A, Joint Statement Action Plan at 3).

Finally, the HVIRA potentially conflicts with the
national goal of creating "enduring legal peace." Eizenstat

1  referred to this goal in his November 30, 1999 letter to Governor

2  Davis.  With regard to the German Foundation, Eizenstat stated,

3  "[c]learly, for this deal to work ... German industry and German

4  government need to be assured that they will get 'legal peace',

5  not just from class-action lawsuits, but from the kind of

6  legislation represented by the California Victim Insurance Relief

7  Act."  (American: Sullivan Decl. Ex. 23, 11/30/99 Eizenstat

8  letter to Governor Davis).  President Clinton and Secretary of

9  State Madeline Albright each echoed this sentiment several weeks

10  later as the negotiations for the German Foundation began to

11  close.  President Clinton, in a December 13, 1999 letter to

12  Chancellor Schroeder, wrote that "the Foundation should be

13  regarded as the exclusive remedy for all claims against German

14  companies arising out of the Nazi era.  [The executive agreement]

15  will state further that both our countries desire all embracing

16  and enduring legal peace to advance our foreign policy

17  interests."  (American: Sullivan Decl. Ex. 6, 12/13/99 Clinton

18  letter to Schroeder).  Albright, when addressing the Slave Labor

19  Meeting in Berlin on December 17, 1999 stated in relation to the

20  German Foundation that "[t]he United States is agreeing to assist

21  in providing legal peace to German companies, both in our courts

22  and from state and local action.  To succeed in achieving legal

23  peace, it is essential that the Foundation be comprehensive."

24  (American: Sullivan Decl. Ex. 9, 12/17/99 Albright remarks).

25         By conflicting so directly with the national

26  government's policies and promises, the HVIRA not only affects

27  international relations, but also has "great potential for

28  disruption or embarrassment."  See Zschernig, 389 U.S. at 435.

1  The HVIRA is inconsistent with Eizenstat's statements regarding

2  the German Foundation as the exclusive remedy for claims from the

3  Nazi era.  It conflicts with the cooperative spirit of the

4  ICHEIC, which the United States supports.  The HVIRA makes the

5  United States' promises in the U.S.-Swiss Joint Economic

6  Statement appear to be unfulfilled.  Finally, "legal peace"

7  cannot be achieved if California and each of the other states are

8  free to enact their own legislation forcing companies to report

9  insurance policies or lose their license.  <u>See</u> Cal. Code Ins. §§

10  13800-13807.

11      Defendant argues that plaintiffs "have not demonstrated

12  that the Holocaust Statutes have an actual direct impact on

13  foreign relations.  Indeed, plaintiffs cannot point to any

14  federal policy enactments that the Holocaust Statutes must give

15  way to." (Opp'n. at 84).  Defendant then cites to the

16  declarations of Robert Brown, the representative of the Minister

17  of Israeli Society in the World Jewish Community, Linda Gerstel,

18  a shareholder in a law firm representing Holocaust victims in

19  class action insurance cases, and Leslie Tick, staff counsel to

20  the Department of Insurance, and an attorney for defendant.[11]

21  Brown states that he took part in the negotiations of the German

22  Foundation settlement and claims that he does "not believe that

23  the [HVIRA] interfered with the negotiations of the Germany

24  Foundation settlement." (Opp'n.: Brown Decl. ¶ 6).  Gerstel

25  testified that she participated in the German Foundation

26

27      [11]   Plaintiffs object on numerous grounds to parts of all

28  three declarations.  Because the court does not rely on the
   declarations, the court does not address the objections.

1  negotiations and states that "[n]othing in the negotiations ...

2  was intended to effect or nullify the powers of the State

3  Insurance Commissioners or any related regulatory scheme

4  including, but not limited to, legislation enacted in

5  California." (Opp'n.: Gerstel Decl. ¶ 7). Tick described the

6  formation of the ICHEIC and its work. Defendant has not made

7  clear which portion of her lengthy declaration and exhibit

8  supports defendant's claim.

9        Defendant's argument is wholly unpersuasive. First of

10 all, as discussed above, several policy makers in the Executive

11 Branch have clearly stated the United States' position with

12 regard to the compensation of Holocaust victims. The fact that

13 several participants in the German Foundation negotiations stated

14 that they do not think that negotiations were compromised by the

15 California statutes is irrelevant. The German Foundation

16 negotiations are simply an illustration of potential foreign

17 affairs that could be affected by the HVIRA. In any case, even

18 if the HVIRA did not actually affect the negotiations, it

19 certainly has the potential to affect foreign affairs and it is

20 embarrassing to the United States to have individual states

21 enacting legislation inconsistent with Executive promises and

22 negotiations. See Zscherniq, 389 U.S. at 435. Thus, the HVIRA

23 interferes with the national government's exclusive power over

24 external affairs. See Pink, 315 U.S. at 233.

25       Second, there does not have to be a formally stated

26 national policy in order for a state to impermissibly interfere

27 with foreign affairs. Under Zscherniq, a state statute that

28 affected international relations in "a persistent and subtle way"

21

1  was held unconstitutional for impacting the federal government's

2  foreign affairs powers.   <u>Zscherniq</u>, 389 U.S. at 440.

3       Finally, defendant's argument confuses the preemption

4  doctrine with the foreign affairs power.   A state cannot pass

5  statutes that interfere with foreign affairs whether or not the

6  national government has a stated policy.   <u>See</u> <u>Pink</u>, 315 U.S. at

7  233 ("Power over external affairs is not shared by the States; it

8  is vested in the national government exclusively.").

9       Defendant cites to <u>Clark v. Allen</u>, 331 U.S. 503 (1947),

10  in support of his argument that plaintiffs must articulate a

11  specific national policy violated by the HVIRA.   <u>Clark</u>, however,

12  does not stand for such a proposition.   In <u>Clark</u>, the Supreme

13  Court held that, generally, rights to succession are determined

14  by local law.   However, those rights may be affected by an

15  overriding federal policy.   <u>See</u> <u>id.</u> at 517.   In <u>Clark</u>, the Court

16  did not find an overriding federal policy, nor did the Court find

17  that the statute had anything more than an "incidental and

18  indirect effect in foreign countries."   <u>See</u> <u>id.</u>   Therefore, the

19  statute did not impermissibly intrude on foreign affairs powers.

20  <u>Clark</u> did not require that there be an overriding federal policy.

21  The Supreme Court simply found that there was none.

22       Defendant further argues that the German Foundation and

23  the ICHEIC are not as comprehensive as the HVIRA with regard to

24  reporting.   Defendant points out that the German Foundation does

25  not have a reporting requirement and that the ICHEIC, as a

26  voluntary organization, does not encompass all the insurance

27  companies addressed by the HVIRA.   These assertions may be true.

28  However, foreign affairs remains the province of the national

1  government; the states do not have authority to fill in perceived
2  gaps in international measures as they see fit.   The United
3  States must be able to speak with one voice on matters of
4  international concern.

5                   3.   <u>More than an Incidental Effect on Foreign Countries</u>

6          Defendant argues that the effect is on foreign
7  companies, not foreign governments, and thus the HVIRA does not
8  violate the foreign affairs policy.   The language of <u>Zscherniq</u>
9  requires that the statute have "more than some incidental or
10  indirect effect in foreign *countries*," not foreign governments.
11  <u>Zscherniq</u>, 389 U.S. at 434.  "Experience has shown that
12  international controversies of the gravest moment, sometimes even
13  leading to war, may arise from real or imagined wrongs to
14  another's subjects inflicted, or permitted by a government."
15  <u>Zscherniq</u> 389 U.S. at 441 (quoting <u>Hines</u> 312 U.S. at 64).

16          Plaintiffs have demonstrated a probability of success
17  in showing that the HVIRA has more than some incidental effect in
18  foreign countries.   In addition to the interference with foreign
19  commerce and the interference with foreign relations, the
20  immediate effect of the statute is to require foreign companies
21  to do an extensive search of warehouses and then compile a
22  massive report, even if the company's only connection with
23  California is through a subsidiary.

24          Plaintiffs have also raised a serious issue that the
25  statutes are in conflict with some European Privacy laws.   For
26  example, in its Amicus brief, the Federal Republic of Germany
27  argues that the disclosure of information and documentation by
28  German insurers to the California Insurance Department without

1  the express authorization of policyholders or their beneficiaries

2  could place the German insurers in violation of the

3  Bundesdatenschutzgesetz (German Federal Data Protection Act,

4  "BDSG").  Federal Republic of Germany Amicus Brief at 6).

5  Violation of the BDSG "may result in criminal as well as civil

6  penalties." (Federal Republic of Germany Amicus Brief at 6).

7  Gerling submits the Declaration of Dr. Spiros Simitis, a

8  professor at Yale Law School and a former Data Protection

9  Commissioner of the German State of Hesse.  After an extensive

10 analysis of the BDSG, Simitis states that "under present

11 conditions, [Gerling's] German affiliates are not allowed to

12 transfer the data requested." (Gerling: Reif Decl. Ex. 10,

13 Simitis Decl. ¶ 28).[12]

14      Defendant argues that in fact, the HVIRA and related

15 statutes do not conflict with the BDSG.  Defendant submits the

16 declaration of Paul Schwartz, a professor at Brooklyn Law School.

17 Schwartz states that he has been recognized as an expert on data

18 protection law.  He disagrees with Simitis' final conclusion and

19 gives his own lengthy interpretation of the BDSG. (Opp'n.:

20 Schwartz Decl. ¶ 6).[13]

21      There is an obvious dispute as to whether the HVIRA

22 conflicts with the German BDSG and other European laws.  The very

23

24 [12]     Simitis also notes that European Union has a Data
   Protection Directive which "explicitly affirms the individual's
25 right to determine the use of her or his data." (Gerling Reif
   Decl. Ex. 10, Simitis Decl. ¶ 11).

26 [13]     Defendant also argues that the ICHEIC has already
   published the names of some German companies policyholders on its
27 website.  Defendant argues that it "defies logic" that the ICHEIC
   would violate German laws.  The question is not before the court
28 as to whether the ICHEIC's actions violated German laws.

1  fact that a state law requires a foreign company to do something

2  that arguably violates the laws of the countries in which it is

3  incorporated or does business shows that the law has an effect on

4  international relations which is more than "incidental."

5       Plaintiffs have made a persuasive showing that the

6  HVIRA interferes with foreign relations, has great potential for

7  disruption or embarrassment, and has more than an incidental

8  effect in foreign countries.  Accordingly, plaintiffs have shown

9  a probability of success on their claim that the HVIRA interferes

10  with the federal government's control over foreign affairs.[14]

11       B.  Commerce Clause

12       The Commerce Clause reserves to Congress the right "to

13  regulate commerce with foreign Nations, and among the several

14  States...."  U.S. Const. art. 1, § 8, cl. 3.  "[E]ven in the

15  absence of specific action taken by the Federal Government," the

16  Commerce Clause limits the powers of states to enact laws

17

18       [14]  Defendant cites Trojan Technologies v. Commonwealth of
     Pennsylvania, 916 F.2d 903 (3rd Cir. 1990) in an attempt to
19  distinguish Zschernig.  In Trojan, the Third Circuit examined a
     Pennsylvania "buy American" statute.  This statute required
20  agencies of the Commonwealth when constructing public works to
     include a provision in all contracts that steel used in the
21  projects must be produced in the United States.  See id. at 904.
     The Third Circuit found this statute did not interfere with the
22  federal government's exercise of the Foreign Affairs power
     because "[t]he Pennsylvania statute exhibits none of the dangers
23  attendant on the statute reviewed in Zschernig."  Id. at 913.
     The Third Circuit noted that the statute was evenhanded in its
24  application, applying to steel from any foreign source "without
     respect to whether the source country might be considered friend
25  of foe."  Id.  Here, while the HVIRA is arguably evenhanded, it
     does exhibit other "dangers" not at issue in Trojan, and thus
26  violates the Foreign Affairs power.  Among other things, the
     HVIRA is inconsistent with several of the national government's
27  statements, policies, and promises, and it potentially violates
     foreign laws.  Thus, it affects foreign relations, is potentially
28  disruptive and embarrassing, and has more than incidental effects
     in foreign countries.

25

1  regulating interstate or foreign commerce.   <u>Wardair Canada, Inc.</u>

2  <u>v. Florida Dep't. of Revenue</u>, 477 U.S. 1, 7-8 (1986).

3            1.  <u>McCarran-Ferguson Act</u>

4            State regulation and taxation of insurance is often

5  excepted from Commerce Clause restrictions through the McCarran-

6  Ferguson Act.  This Act was passed in the wake of <u>United States</u>

7  <u>v. South-Eastern Underwriters Association</u>, 322 U.S. 533 (1944),

8  which held that insurance is "commerce" within the meaning of the

9  Commerce Clause.   <u>See</u> <u>Western and Southern Life v. State Board of</u>

10 <u>Equalization of Cal.</u>, 451 U.S. 648, 653-654 (1981).  Congress,

11 believing "that the business of insurance is 'a local matter, to

12 be subject to and regulated by the laws of the several States,'"

13 enacted the McCarran-Ferguson Act, which Congress intended to

14 restore state taxing and regulatory powers over the insurance

15 business to their pre <u>South-Eastern Underwriters</u> scope.  <u>See</u> <u>id.</u>

16 at 654 (quoting H.R. Rep. No. 143, 79th Cong., 1st Sess., 2).

17 Specifically, the Act states, "[t]he business of insurance, and

18 every person engaged therein, shall be subject to the laws of the

19 several States which relate to the regulation or taxation of such

20 business."   15 U.S.C. § 1012(a).

21            Defendant thus argues that the HVIRA is exempted from

22 Commerce Clause restrictions by the McCarran-Ferguson Act.  The

23 HVIRA, however, does not appear to fall within the scope of

24 regulations intended to be exempted by the Act.

25            In <u>Federal Trade Commission v. Travelers Health</u>

26 <u>Association</u>, 362 U.S. 293 (1960), the Supreme Court held that the

27 Federal Trade Commission could issue a cease and desist order

28 against certain insurance practices by a Nebraska insurance

1  company.  The company's activities, selling insurance through an

2  interstate mail order insurance business, were extraterritorial,

3  and thus were not regulated by state law within the meaning of

4  the McCarran-Ferguson Act.  See id. at 298.  Thus, the insurance

5  practices were not immune from federal control.  The court stated

6  that it is clear from the debate surrounding the implementation

7  of the McCarran-Ferguson Act "that Congress viewed state

8  regulation of insurance solely in terms of regulation by the law

9  of the State where occurred the activity sought to be regulated.

10 There was no indication of any thought that a State could

11 regulate activities carried on beyond its own borders."  Id. at

12 300.

13        The Ninth Circuit discussed the holding in Travelers in

14 its opinion in In re Insurance Antitrust Litigation v. Ace Check

15 Cashing Inc., 938 F.2d 919 (1991), aff'd in part, rev'd in part

16 by Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993).

17 "[E]stablished law blocks regulation by one state of the United

18 States of the insurance business outside the borders of that

19 state."  Id. at 928.  "[A] state does not have power to regulate

20 in any way contracts of insurance or reinsurance entered into

21 outside its jurisdiction even though the risks covered were risks

22 within the state."  Id.

23        Here, the HVIRA attempts to regulate the decision

24 making authority of European insurance companies to pay or not to

25 pay claims on European policies.  See Cal. Ins. Code. § 13801(f)

26 ("This chapter is necessary to ... encourage the development of a

27 resolution to these [Holocaust era insurance claim] issues

28 through the international process or through direct action by the

27

1  State of California."). The HVIRA specifically asks for

2  information about insurance policies sold "directly or through a

3  related company, to persons in Europe, which were in effect

4  between 1920 and 1945." Cal. Ins. Code § 13804(a). Clearly the

5  "State where occurred the activity sought to be regulated" was

6  not California. Travelers, 362 U.S. at 300.

7        Further, in discussing the passage of the McCarran-

8  Ferguson Act, the Supreme Court stated, "[o]ne of the major

9  arguments advanced by proponents of leaving regulation to the

10  States was that the States were in close proximity to the people

11  affected by the insurance business and, therefore, were in a

12  better position to regulate that business than the Federal

13  Government." Id. at 302. Although some of the people affected

14  by the HVIRA may now be California residents, the HVIRA makes no

15  distinction between reporting insurance policies related to

16  California residents and insurance policies related to residents

17  of any other state or foreign county. There is no legitimate

18  reason why California should regulate the reporting of these

19  policies.

20        Under SEC v. National Secur. Inc., 393 U.S. 453, 460

21  (1969), licensing companies is considered the "business of

22  insurance" within the meaning of the McCarran-Ferguson Act.

23  However, the gist of the HVIRA is not about licensing insurance

24  companies, but rather about forcing companies to report on

25  insurance policies issued in Europe and using the threat of

26  license suspension as an enforcement mechanism.

27        The McCarran-Ferguson Act does not insulate the HVIRA

28  from analysis under the Commerce Clause.

28

1                2.  <u>Violations of the Commerce Clause</u>

2         Plaintiffs have shown a probability that the HVIRA

3 violates the Commerce Clause.  Although there is only one

4 Commerce Clause, "state restrictions burdening foreign commerce

5 are subjected to a more rigorous and searching scrutiny" than are

6 regulations on interstate commerce.  <u>South-Central Timber Dev.,</u>

7 <u>Inc. v.  Wunnicke</u>, 467 U.S. 82, 100 (1984).  The section of the

8 commerce clause dealing with foreign commerce is often referred

9 to as "the Foreign Commerce Clause."

10                a.  <u>One Voice</u>

11         The Foreign Commerce Clause is a subset of the broader

12 foreign affairs powers discussed above.  "Foreign commerce is

13 pre-eminently a matter of national concern."  <u>Japan Line, LTD. v.</u>

14 <u>County of Los Angeles</u>, 441 U.S. 434, 448 (1979).  "In

15 international relations and with respect to foreign intercourse

16 and trade the people of the United States act through a single

17 government with unified and adequate national power."  <u>Id.</u>  "The

18 Federal Government must speak with one voice when regulating

19 commercial relations with foreign governments."  <u>Id.</u>

20         The HVIRA potentially prevents the federal government

21 from speaking with one voice in its expectations of foreign

22 insurance companies.  Under the HVIRA, foreign insurance

23 companies must conduct an extensive and thorough search for

24 records.  <u>See</u> Cal. Ins. Code §§ 13804(a) and 13804(b).  Further,

25 the companies must certify whether or not claims of Holocaust

26 victims have been paid, and must certify whether or not they have

27 searched for the victims.  <u>See</u> Cal. Ins. Code § 13804(b).  These

28 demands emanate not from the national government, but from an

individual state, and would be in conflict with the national

government's promises to Germany that the German Foundation would

be the exclusive relief for claims from Holocaust victims.[15]

### 3.   Commerce Outside State Borders

The Commerce Clause "precludes the application of a

state statute to commerce that takes place wholly outside of the

State's borders, whether or not the commerce has effects within

the State." Healy v. Beer Ins., 491 U.S. 324 (1989).   Defendant

argues that the commerce does not take place wholly outside of

California's borders.   "The critical question is whether the

practical effect of the regulation is to control conduct beyond

the boundaries of the State."   Id. (citing Brown Forman

Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573,

579 (1986).

The practical effect of the HVIRA is that insurance

companies that sold policies during the applicable time period

must make an extensive search of their warehouses to come up with

a list of individuals that might include Holocaust victims.   It

is common sense that most, if not all, of the companies that sold

policies in Europe from 1920-1945 were European.   They are being

asked to gather voluminous European records of policies sold to

Europeans and to report these records to California.   The

required records are not in any way tailored toward California

───────────────

[15]   Defendant points out that commerce is controlled by
Congress, not the Executive Branch.   See Barclays Bank v.
Franchise Tax Bd., 512 U.S. 298, 329 (1994).   However, Congress
"may delegate very large grants of its power over foreign
commerce to the President, who also possesses in his own right
certain powers conferred by the Constitution on him as Commander-
in-Chief and as the Nation's organ in foreign affairs."   Id.
(internal quotations omitted).

citizens.  The only connection to California is that the statute
is enforced by taking away the company's or its affiliate's
California license and the reporting is done to California.
Clearly, California is meddling in foreign commerce entirely
outside its borders.

Plaintiffs have shown a probability of success on the
merits that the HVIRA violates the Commerce Clause.

C.   <u>Other Constitutional Claims</u>

Because the court finds that plaintiffs have
demonstrated a probability of success on the merits that the
HVIRA is unconstitutional based on a violation of the federal
foreign affairs power and a violation of the Commerce Clause, the
court does not address the remaining constitutional issues.

IV.  <u>Irreparable Injury</u>

It is the plaintiff's burden to demonstrate that the
balance of irreparable harm favors the plaintiff.  <u>See</u> <u>Carribean</u>
<u>Marine Servs. Co. v. Baldridge</u>, 844 F.2d 668, 674 (9th Cir.
1988).  "Speculative injury does not constitute irreparable
injury sufficient to warrant granting a preliminary
injunction.... a plaintiff must demonstrate immediate threatened
injury as a prerequisite to preliminary injunctive relief."
Plaintiffs have met this burden.

The required reports under California Insurance Code
section 13804 were due April 7, 2000.  <u>See</u> Cal. Code Regs. §
2278.  Under section 13806, if the parties did not file the
reports by May 7, 2000, the Commissioner "shall suspend the
certificate of authority to conduct insurance business in the
state."  Cal. Ins. Code § 13806.

1    Plaintiffs have demonstrated that suspension of their

2    licenses to practice insurance in the state of California would

3    cause them irreparable harm.  Such suspension could undermine the

4    goodwill of the company because the market may infer that the

5    company is unstable.  Further, a suspension would prevent

6    plaintiffs from being able to renew contracts for their existing

7    policy holders causing further loss of goodwill.  See Rent-a-

8    Center, Inc. v. Canyon Television and Appliance, 944 F.2d 597,

9    603 (9th Cir. 1991) (affirming preliminary injunction and holding

10   that damage to the goodwill of a business supports a finding of

11   irreparable injury).

12    In addition, suspension is likely to cause reputational

13   injury resulting in a loss of market share.  See United Services

14   Automobile Ass'n v. Muir, 792 F.2d 356, 362 (3rd Cir. 1986).

15   Suspension might suggest marketplace fraudulent or illegal

16   activity or financial instability.  See id.  Plaintiffs point out

17   that suspending their licenses will imply publicly that the

18   companies are implicated with the wrongdoings of the Holocaust,

19   has acted illegally, or is not financially sound.  Indeed, the

20   Commissioner has already made such implications.  For example,

21   the California Department of Insurance has a website.  One page

22   is dedicated to Winterthur.  Next to Winterthur is a picture of a

23   concentration camp.  The caption reads, "This company is an

24   affiliate of one of what could be many companies that have

25   outstanding, unpaid claims owed to Holocaust survivors, their

26   heirs and beneficiaries, for life and property loss resulting

27   from the atrocities committed during the Holocaust.  It is time

28   for justice." (Winterthur: Smith Decl. Ex 1;

1   http://www.insurance.ca.gov/docs/FS-Holocau st.htm.  Suspending

2   Winterthur's license would further implicate the company, causing

3   irreparable harm.  See Ross-Simons, Inc. v. Baccarat, Inc., 102

4   F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to

5   goodwill and reputation is not easily measured or fully

6   compensable in damages.  Accordingly, this kind of harm is often

7   held to be irreparable.").

8          The public interest is also an important factor to be

9   considered in a suit for injunctive relief affecting the public

10  interest.  See Miller v. California Pac. Med. Ctr., 991 F.2d 536,

11  540 (9th Cir. 1993).  If plaintiffs' licenses are suspended, the

12  companies would not be able to write any new business in

13  California.  Although they would be obligated to service claims

14  on existing policies until those policies expired by their

15  natural terms, the companies would not be able to modify or renew

16  the existing policies.  For example, if a policyholder wanted to

17  increase her policy limits, she would not be able to do so.

18         In many cases, the existing policy will expire within

19  the year.  At the end of the year, policyholders will be

20  scrambling to find new insurers.  This task could become more

21  difficult due to the decreased number of insurance companies in

22  the state as a result of the suspension provisions of the HVIRA.

23         Finally, license suspension would undoubtably affect

24  the insurance companies' employees.  Companies that could no

25  longer write policies in California would likely have to lay off

26  or fire their employees engaged in underwriting and sales.

27  Plaintiffs have demonstrated that irreparable harm will likely

28  occur if the HVIRA is enforced.

1  V.   <u>Conclusion</u>

2          None of the plaintiffs deny that the Holocaust was a

3  terrible atrocity.  And none of the plaintiffs deny that the

4  victims and their heirs and beneficiaries should be compensated

5  to the extent possible.  However, even though the end goal of

6  such compensation is laudable, this goal may not be achieved

7  through unconstitutional means.  Plaintiffs have shown a

8  probability of success on the merits of their claim and have

9  shown that irreparable harm will occur if the court does not

10 enjoin enforcement of the HVIRA.

11         IT IS THEREFORE ORDERED that plaintiffs motions for

12 preliminary injunction be, and the same hereby are, GRANTED.

13         Pending final judgment in these actions, defendant is

14 enjoined from enforcing the provisions of the Holocaust Victim

15 Insurance Relief Act and the accompanying regulations.  Cal. Ins.

16 Code §§ 13800-13807 and Cal. Code Regs. §§ 2278-2278.5.

17 DATED: June 9, 2000

18

19                              _____
                                WILLIAM B. SHUBB
20                              UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28